IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| XTRALIGHT MANUFACTURING, LTD., | § | Case No. 18-31857-11 |
| | § | |
| Debtor. | § | |

**DECLARATION OF JERRY CAROOM IN SUPPORT
OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Pursuant to 28 U.S.C. § 1746, I, Jerry Caroom, declare under penalty as follows:

1. I am the Manager and a Member of XLM Management, LLC ("XLM Mgt"), the general partner of XtraLight Manufacturing, Ltd. ("XtraLight" or "Debtor"), which has a place of business at 8812 Frey Road, Houston TX 77002. I am duly authorized to execute this declaration on behalf of XtraLight, in support of the above-referenced Chapter 11 Petition and the First Day Motions related thereto. I have served in this capacity for the Debtor since approximately January 25, 2000, and I am familiar with the Debtor's business, day-to-day operations, and financial affairs.

2. I submit this Declaration to assist the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") and other parties in interest in understanding the circumstances that compelled the Debtor's commencement of this Chapter 11 case (the "Case") and in support of the Debtor's voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") and the pleadings filed by the Debtor on the date hereof (the "Petition Date") in the Bankruptcy Court. I have reviewed the factual support set forth in each of the Debtor's "First Day" pleadings (described below) and attest to the accuracy thereof. Except as indicated otherwise, all facts set forth herein are based on my personal knowledge,

{111881/00002/01217321.DOCX 1}

1

discussions with current and former members of the Debtor's senior management and professional advisors, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on the Debtor's behalf.

## OVERVIEW OF THE DEBTOR'S BUSINESS

### A. General Company Information

3. XtraLight was founded in 1986. In 1992, the company was organized as a Texas corporation. The entity was converted to a Texas limited partnership in 2000. In 2000, I purchased a 50.1% interest in XtraLight. I purchased the remainer in December 2004. XtraLight is managed by its general partner, XLM Mgt. In 2011, the company name was changed from X-tra Light Manufacturing Partnership, Ltd. to XtraLight Manufacturing, Ltd.

4. I am the sole member, sole officer and manager of XLM Mgt. XLM Mgt owns a 1% general partnership interest in XtraLight and I personally own a 99% limited partnership interest.

5. XtraLight maintains its corporate offices and manufacturing facility at 8812 Frey Road, Houston, TX. XtraLight also maintains regional offices in Hammond, LA and Raleigh, NC.

6. XtraLight has two primary divisions: an led lighting manufacturing business which is based in Houston and its Utility Metering solutions division which is based in Hammond, Louisiana which installs smart meters on primarily quasi-public projects.

7. XtraLight retained Statesmen as a broker to assist with the sale of its lighting division in late 2017. The initial estimates are that the lighting division alone is worth approximately $18 million. As such, the Company would be valued at well over $20 million.

While the lighting division has suffered some business loss in recent quarters, sale prospects for the lighting division are strong and business is expected to increase in the second quarter.

8. XtraLight also has $9,163,065.08 in personal property including contracts, receivables, accounts, deposits, leasehold improvements, inventory, etc.

9. XtraLight has liabilities exceeding $13 million which includes wage claim litigation pending in Boston, Massachusetts related to a project that was completed by the utility metering division. XtraLight strenuously denies any liability in the litigation. The litigation has cost the Debtor hundreds of thousands in legal fees, frustrates efforts to sell the lighting division and operate the business. While XtraLight believes it has no liability it still has the risk, delay and costs inherent in litigation of any type.

10. XtraLight's liabilities also include bank debt owed to BBVA Compass Bank of approximately $5 million. Company revenues for 2017 were approximately $33.3 million and year to date, through March 2018, are approximately $5.8 million. XtraLight currently employs 125 full time employees, including 7 management and executives.

### B. Lighting Division

11. XtraLight's lighting division is located in Houston, Texas. It has manufactured and distributed commercial and industrial lighting fixtures since 1986. The Company provides high-performance, energy efficient light emitting diode ("LED") lighting platforms for both interior and exterior commercial and industrial applications and also continues to sell some legacy lighting products using high intensity fluorescent technology. The Company offers different products suited for indoor, outdoor, and architectural new construction and retrofit applications in street, parking lot, auto dealership, educational, office, retail, industrial, municipal, food processing, warehouse, data center, and parking garage lighting.

{111881/00002/01217321.DOCX 1 }

3

12. XtraLight is committed to developing LED product offerings in all of the markets it serves and is a leader in designing easy installation of low maintenance lightweight fixtures that deliver quality lighting at reduced cost. LED lighting technology allows for better optical performance, significantly reduced maintenance costs, due to performance longevity, and reduced energy consumption. Due to their size and flexibility in application, LED lighting systems can address opportunities for retrofit applications than cannot be satisfied by fluorescent or other legacy technologies. XtraLight estimates their lighting systems generally reduce lighting related electricity costs by approximately 50% to 80% compared with High Intensity Discharge ("HID") lighting solutions, while increasing the quantity of light by approximately 50% and improving lighting quality. By permanently reducing lighting related electricity usage, the company's systems enable customers to achieve significant cost savings without compromising the quantity or quality of light in their facilities; offering customers a rapid return on their investment.

13. XtraLight's products are targeted for applications in three primary market segments: commercial office and retail; area lighting; and; industrial applications. Primary customers consist of large and medium sized companies, electrical distributors, system integrators, electric utilities, energy service companies, and electrical contractors. Virtually all sales occur within the United States. Revenue is generated from sales of lighting systems and related services to governmental, commercial and industrial customers on a project by project basis. These projects comprise both new construction and / or replacement of legacy lighting systems, which is referred to as a "retrofit". XtraLight offers its customers a single source solution whereby the company manages and is responsible for the entire project, including installation through its affiliate XtraLight Services, across the entire North American market.

14. XtraLight has a large and growing national customer base and has installed its products at numerous commercial and industrial facilities across North America. The willingness of the Company's blue-chip customers to install its products across multiple facilities represents a significant endorsement of the company's capabilities in total project design and management.

15. In addition to selling directly to national accounts, the company is increasingly emphasizing selling its lighting products and services to end users through electrical distributors and sales reps. Over the past three years, XtraLight has engaged manufacturer representative agencies to expand the company's reach and inclusion in projects at an earlier stage. XtraLight has a network of 35 agencies covering the US and Canadian markets hopes to continue to develop and expand this network in the coming years

16. XtraLight has invested over $3 million in establishing the American Testing and Assessment Laboratories which is accredited under the US Dept. of Commerce National Institute of Standards & Technology's National Voluntary Laboratory Accreditation Program. This state of the art onsite testing facility is able to perform 44 types of testing in the energy-efficient lighting products category which dramatically enhances the company's ability to innovate and compete on unique, high-end and short-time line projects. XtraLight is able to test 100% of its production prior to shipment, enabling the company to provide an industry leading 10-year warranty on many products.

### C. Utility Metering Solutions Division

17. In 2009, XtraLight acquired Utility Metering Services ("UMS"), a product-independent firm specializing in the design, build, integration, and maintenance of utility programs. UMS operates as a division of XtraLight.

18. UMS offers its customers specialized utility metering programs, including Advanced Metering, Billing Systems, Smart City Design & Integration, Network Lighting & Controls, and Water Conservation, customized to accommodate each customer's needs.

19. Advanced Metering is a broad term that can be used to describe Automatic Meter Reading (AMR) or Advanced Metering Infrastructure (AMI) programs. In general, the technology enables automatic communication between meters or sensors and a utility. AMR systems enable one-way communication from a meter to a meter-reading device. Data is collected at regular, pre-determined intervals (daily, weekly, monthly, etc.) by walk-by, drive-by, or fixed network methods, and is provided to the utility for billing. AMI is an integrated system of smart meters, communication networks, and data management systems that enables two-way, real-time communication between utilities and customers.

20. By combining the best technology, solutions, and support, UMS enables its clients to improve customer service, manage workforces more effectively, recover lost revenue, and conserve resources. UMS offers a wide range of standalone services—from feasibility and design, to meter installation, to systems integration—to comprehensive end-to-end utility programs.

### D. Other Related Non-Debtor Businesses

21. XtraLight Services is a sole proprietorship that I own. XtraLight Services commenced operations long before I acquired XtraLight. In fact, XtraLight Services was the largest customer of XtraLight when I acquired the company. XtraLight Services provides logistics and installation of lighting systems for XtraLight's customers. As further described below in the section regarding prepetition wages, XtraLight Services shares certain employees with XtraLight. Payroll costs for these shared employees are apportioned accordingly.

{11881/00002/01217321.DOCX1}

6

22. Cay Capital LLC ("Cay Capital") is a Texas limited liability company which owns the real property located at 8812 Frey Road, Houston, Texas ("Property") where the Debtor conducts its manufacturing operations. I am the sole member of Cay Capital. Compass Bank is the secured lender and retains a first lien on the Property. On January 1, 2012, the Debtor entered into a rental lease agreement with Cay Capital for the lease of the Property. The Debtor pays monthly rent to Cay Capital of $34,000 for the lease of the Property.

23. Lighting Exports, Inc is a Texas corporation that I own. This company was formed as an Interest Charge-Domestic International Sales Corporation organized for favorable tax treatment of export sales. This company has had very limited activity.

24. Illumination Casualty Corp. is an insurance company that I own which provides insurance services to the Debtor and which has loaned funds to the Debtor.

## SECURED FINANCING HISTORY

25. On or about April 23, 2010, Debtor and XtraLight Services (collectively "Borrowers"), entered into a Master Loan Agreement with Compass Bank ("Compass Bank" or "Lender") and related documents ("Loan Agreement") whereby Lender agreed to make certain loans to Borrowers up to approximately $3.3 million ("Compass Bank Loans"). The Loan Agreement was subsequently amended to include additional terms and/or loans to Borrowers in the First Amendment to Loan Agreement dated as of August 31, 2011, by the Second Amendment to Loan Agreement dated as of October 26, 2011, by the Third Amendment to Loan Agreement dated as of March 14, 2012, by the Fourth Amendment to Loan Agreement dated as of October 24, 2012, by the Fifth Amendment to Loan Agreement dated as of April 3, 2013, by the Sixth Amendment to Loan Agreement dated as of August 31, 2013, by the Seventh Amendment to Loan Agreement dated as of July 1, 2014, by the Eighth Amendment

{11881/00002/01217321.DOCX 1}

7

to Loan Agreement dated as of August 29, 2015, by the Ninth Amendment to Loan Agreement dated as of November 6, 2015, by the Tenth Amendment to Loan Agreement dated as of June 30, 2016, by the Eleventh Amendment to Loan Agreement dated as of August 29, 2017 and by the Twelfth Amendment to the Loan Agreement dated as of December 21, 2017 (the Loan Agreement, together with all amendments, is collectively referred to hereafter as the "Loan Agreement").

26. As of the Petition Date, the Debtor is indebted to Lender in the aggregate approximate amount of $5 million ("Indebtedness") with respect to the following Compass Bank Loans:

| Loan | Original Loan Date | Amount Loaned | Monthly Payment | Current Balance |
|---|---|---|---|---|
| Advancing Term Note (#XXXXXXX83) | 12/21/2017 | $500,000.00 | $9,150.00 | $481,412.00 |
| Consolidated Revolving Note[1] | 4/23/2010 | Up to $6 million | Interest Only | $4.4 million |
| Term Note A | 4/23/2010 | $173,214.20 | $0 | $0 |
| Term Note B | 4/23/2010 | $193,177.44 | $0 | $0 |
| Term Note C | | $1,800,000 | $0 | $0 |
| Term Note D (#XXXXXXX67) | | $1,000,000 | $27,778.00 | $194,444.00 |

27. My understanding is that the Compass Bank Loans are secured by first liens on substantially all assets of the Debtor, including, but not limited to, its cash and accounts receivable.[2] The proceeds of the Compass Bank Loans were utilized to purchase equipment and fund Debtor's operations.

---

[1] The Consolidated Revolving Note was originally two separate revolving notes entered into on or about April 23, 2010, with an aggregate credit line of $3 million. Subsequently, the notes were consolidated and modified to increase the line of credit to $6 million.
[2] As part of the DIP Facility, a deadline for the challenge of any liens or priorities will be agreed upon.

{111881/00002/01217321.DOCX 1 }    8

# EVENTS LEADING TO CHAPTER 11

28. Prior to the bankruptcy filing, XtraLight operated in a normal business manner. XtraLight's lighting division was being marketed for sale and the first quarter showed a loss which was in large part due to excessive legal fees being incurred in the employee litigation filed in Boston, Massachussetts in the case styled *Israel Aponte and others v. XtraLight Manufacturing, Ltd. d/b/a Utility Metering Solutions, et al.*, Suffolk Superior Court, Civil Action No. 16-36316H.

29. In 2016, a former employee initiated litigation against the Debtor for a wage claim. On information and belief, the employee is a serial litigant. Ultimately, a group of 28 additional former employees joined the suit and are seeking damages for alleged prevailing wage claims which plaintiffs allege exceed $12 million in the aggregate if the plaintiffs were to prevail.

30. XtraLight has vigorously denied the allegations and continued to defend itself in the litigation. However, litigation costs attendant with this matter have exceeded $600K and continue to average $37K per month and were expected to increase to a minimum of $50K per month as the parties engaged in further discovery up to trial. The costs for the litigation prior to trial are easily estimated to exceed $1.5 million. The trial costs, appeal costs, delay and uncertainty caused further concern.

31. These crippling costs, coupled with risks associated with litigation; potential for the litigation to frustrate the sale of the lighting division; distraction of the litigation from the core business; and, risk that sales could decline if management is distracted prompted the filing of this Chapter 11 case.

32. In Spring 2016, the Debtor received a subcontract with Barletta Construction to install automatic water meter reading systems ("smart meters") to Boston Water & Sewer. Debtor

was expected to hire local employees and, in fact, hired local employees. Its employees from Louisiana managed and supplemented the local work force.

33. The Plaintiffs' Third Amended Complaint asserts the Debtor violated the Massachusetts Prevailing Wage Act allegedly because of a company policy where it failed to pay applicable prevailing wage rate for all prevailing wage-compensable time worked by Plaintiffs and in violation of the Massachusetts Minimum Wage Act and the Massachusetts Overtime Act. Plaintiffs also allege unjust enrichment. At the core of the lawsuit is whether the employees were paid the prevailing wage rate for all prevailing wage-compensable time and a dispute over whether the Plaintiffs had more compensable time than was paid.

34. The Debtor denies any liability and asserted counterclaims against the Plaintiffs for fraud and misrepresentation and unjust enrichment for overpayment of wages.

## FIRST DAY MOTIONS

35. Contemporaneously with the filing of this Chapter 11 Case, the Debtor has filed a number of First-Day Motions. A hearing on these motions is scheduled a hearing for April 13, 2018 (the "First-Day Hearing"), during which the Court will entertain the argument of counsel with respect to the relief sought in the First-Day Motions. To the extent any factual background in the First Day Motions conflicts with this Declaration, the facts in the Declaration supersede.

36. Generally, the First-Day Motions have been designed to meet the immediate goals of: (a) establishing procedures for the efficient administration of the cases; (b) continuing the Debtor's operations during these cases with as little disruption and loss of productivity as possible; and (c) maintaining the confidence and support of vendors, customers, employees, and other key constituencies.

37. I have reviewed each of the First-Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First-Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve success in the Chapter 11 Case.

38. The First-Day Motions are identified and more fully described below[3].

**_DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER APPROVING (I) PAYMENT OF PRE PETITION EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION, BENEFITS, AND REIMBURSABLE EMPLOYEE EXPENSES, AND (II) TAXES, AND (III) CONTINUE EMPLOYEE BENEFITS PROGRAM AND ORDINARY COURSE PRACTICES._**

39. In order to enable the Debtor to retain its current employees (the "Employees") during this critical time, minimize the personal hardship such Employees may suffer if pre-petition employee-related obligations are not paid when due, or honored as expected, and maintain morale, the Debtor, by this motion, are seeking authority, in its discretion, to pay and/or honor, as the case may be, (a) certain pre-petition claims of Employees, including, but not limited to, claims for wages, salaries, vacation, sick leave, 401(k) obligations, and unpaid reimbursable expenses and certain costs and disbursements related to the foregoing (collectively, the "Employee Compensation"), up to the statutory cap of $12,850 per Employee, (b) all pre-petition federal and state withholding obligations and (c) agreement with and obligations owed to PayCom Payroll, LLC, its payroll services provider. The Debtor further requests that the Court enter an order directing all banks to honor the Debtor's pre-petition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First-Day Motion.

{11181/00002/01217321.DOCX 1 }

11

40. The Employees are essential to the continued operation of the Debtor's business and the Employees' morale directly affects their effectiveness and productivity. Consequently, it is critical that the Debtor continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date. If the checks issued and electronic fund transfers requested in payment of any of the compensation or other Employee obligations are dishonored, or if such obligations are not timely paid post-petition, the Employees may likely suffer extreme personal hardship and may be unable to pay their daily living expenses. A loss of employee morale and goodwill at this crucial juncture would undermine the Debtor's stability, and undoubtedly would have a negative effect on the Debtor and other customers, the value of its assets and business, and its ability to achieve its objectives in Chapter 11.

41. The Employees' payroll is due to be paid April 13, 2018 with electronic transfers to be made the morning of April 13, 2018.

***EMERGENCY MOTION OF XTRALIGHT MANUFACTURING, LTD., FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) CONTINUE TO OPERATE ITS CASH MANAGEMENT SYSTEM AND MAINTAIN EXISTING BANK ACCOUNTS AND (B) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS, AND (II) GRANTING RELATED RELIEF***

42. The Debtor operates a consolidated cash management system which is described in this motion. As set forth therein, the system builds in efficiencies that should be preserved during the Chapter 11 Case for the benefit of the secured parties as well as to keep costs and administration to a minimum, which will benefit all creditors.

43. By the motion, the Debtor seeks an order: (a) authorizing the continued use of the Debtor's existing bank accounts and continued use of existing business forms and checks; (b) continued use of the existing cash management system and Intercompany System; and, (c) providing any additional relief required in order to effectuate the principal relief sought in the

motion. The relief requested will help ensure the Debtor's smooth transition into Chapter 11 and avoid the possible disruptions and distractions that could otherwise divert the Debtor's attention from more pressing matters during the initial days of this Chapter 11 case. A chart and explanation of the Debtor's cash management system is included in the motion.

44.     The Debtor has some outstanding checks which are primarily vendor checks which may not have cleared prior to the filing of the Petition but which the Debtor asks be processed in the ordinary course under the Cash Management Systems. The credit line reflects the liability for the checks.

45.     As of April 11, 2018, after the close of business, the amount outstanding on the credit facility was $4,463,524 which is different from the $4,300,000 included in the First Day Motions

**<u>UNOPPOSED EMERGENCY MOTION (I) FOR INTERIM AUTHORITY TO USE CASH COLLATERAL (II) TO INCUR POST PETITION INDEBTEDNESS UNDER 11 U.S.C. §363, §364(b), §502(b), §503(b) AND §105 AND (III) REQUEST FOR PRELIMINARY AND FINAL HEARINGS</u>**

46.     Pursuant to this motion, the Debtor is seeking authority for the use of Cash Collateral, to incur post petition indebtedness and to grant to the Secured Lender adequate protection for claims arising from the diminution of value of its collateral from the Debtor's use of the Cash Collateral. The post petition financing shall be secured by second priority liens on all of the Debtor's assets and an allowed super priority claim.

47.     Compass Bank has agreed to Debtor's use of cash collateral in connection with the budget attached to the motion and to provide the post petition financing described therein.

48.     It is essential to the Debtor's post-petition operations, the maintenance of the value of its business, that it use Cash Collateral. Cash Collateral will only be used to pay for expenses that are set forth in a budget attached to the motion.  Such expenses include, but are not limited

to, employee payroll and other benefits, rent, rent on leased equipment, corporate overhead, inventory purchases, medical supplies, expenses related to patient health and welfare, various reorganizational expenses, and other expenses related to operating the business. To the extent that revenues are insufficient to pay these expenses, the Debtor will need post petition financing as a source of payment. Compass Bank has agreed to provide the post petition financing described in the motion.

49.   The Debtor has prepared a budget (the "Budget") that shows the Debtor's projected expenditures during the period from the Petition Date through April 25, 2018 (the "Budget Period") and estimates the period in which such cash expenditures will either need to be paid or accrue. At this time, the Debtor anticipate that cash and receipts from operations, coupled with the DIP Financing, will be sufficient to satisfy the disbursements reflected in the Budget. After entry of a final order authorizing the use of Cash Collateral and post-petition financing, and the expiration of the Budget, the Debtor will submit additional, amended, and/or supplemental Budgets for periods occurring after the Budget Period.

50.   The reasons supporting the Debtor's use of Cash Collateral are compelling. As the Debtor has limited cash flow, use of Cash Collateral is required to fund the day-today operating expenses of the business, including payments to employees, purchase of inventory and payment of other expenses necessary for operations, as well as reorganizational expenses necessary to maintain the value of the business. Unless this Court authorizes use of the Cash Collateral and post-petition financing, the Debtor will be unable to pay for services and expenses necessary to preserve and maximize the value of the Debtor's business and its bankruptcy estate. Indeed, absent sufficient funds to support operations, the value of the Debtor's assets will quickly erode.

Therefore, authorization to use Cash Collateral and obtain post petition financing pending the Final Hearing is in the best interests of the Debtor's bankruptcy estate and creditors.

51. In exchange for the use of Cash Collateral, as adequate protection for the use of the Cash Collateral, but only to the extent of the actual diminution in value of the pre-petition Collateral, the Debtor proposes to grant to the Secured Lender replacement liens in the form of security interests and liens upon the same types and kinds of assets upon which they held a prepetition lien, subject only to valid, perfected, and enforceable prepetition liens (if any) which are senior as of the Petition Date, as well as an additional lien upon the Debtor's post-petition accounts and accounts receivables. The grant of replacement liens will only apply to the extent that the pre-petition Collateral was encumbered by valid and perfected liens and security interests (collectively, the "Replacement Liens").

52. In connection with the post petition DIP Financing, the post petition debt shall be secured by second priority liens on all of the Debtor's assets and an allowed super priority claim pursuant to 11 USC § 364(c).

## CONCLUSION

53. The primary purpose of the filing of this Case is to maintain the operations and to prevent deterioration and to protect the going-concern value of the business operated by the Debtor while the Debtor effectuates a plan of reorganization or disposition of its assets. In the interim, through the First-Day Motions described above, the Debtor seeks to minimize certain adverse effects that these Case might otherwise have on its business, while honoring the spirit of the Chapter 11 process.

54. In order to preserve the value of its business to the fullest extent possible, the Debtor's immediate objective is to maintain "business as usual" following the commencement of

{111881/00002/01217321.DOCX 1 }

15

this Case by minimizing the adverse impact of the filing on the Debtor's assets and operations.

For the reasons described herein and in the First-Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in each of the First-Day Motions and respectfully request the Court to do so.

Under penalty of perjury, I declare that the foregoing is true to the best of my knowledge and belief.

Dated: April 11, 2018
Houston, Texas

_____
Jerry Cardon